**Yolanda ALI and Mohamed Ali, on behalf of themselves and all other persons similarly situated, Plaintiffs,**

**v.**

**IMMIGRATION AND NATURALIZATION SERVICE, et al., Defendants.**

**Civ. A. No. 85–4403–MA.**

United States District Court, D. Massachusetts.

June 13, 1986.

William G. Southard, Bingham, Dana & Gould, Marjorie Heins, Mass. Civil Liberties Union Foundation, Boston, Mass., for plaintiffs.

Susan Winkler, Asst. U.S. Atty., Boston, Mass., for defendants.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

This action challenges the constitutionality of the Immigration and Naturalization Service's (INS) marriage petition process. An alien married to an American citizen is entitled to immediate relative status and is exempt from the usual quota restrictions on immigration. Because such marriages can also be mere devices to circumvent immigration restrictions, the INS scrutinizes marriage petitions filed on behalf of alien spouses. Plaintiffs Yolanda Ali, an

American citizen, and Mohamed Ali, her alien spouse, believe that the INS' skepticism leads it to handle marriage petitions in an unfairly abrupt manner and to apply undue pressure on the couple to admit their marriage is a sham. Accordingly, plaintiffs seek an injunction requiring the INS to adopt new procedures for verifying marriages such as theirs. They also want deportation proceedings against Mohamed Ali postponed and they seek to recover money damages for violations of their constitutional rights.

Defendants are Allen W. Provencal and Robert Molvar, two INS criminal investigators; Charles T. Cobb, director of INS District 2 (which includes Massachusetts, Rhode Island, Connecticut and most of New Hampshire); Alan C. Nelson, Commissioner of the INS; and, Edwin Meese III, Attorney General of the United States, who is charged with administering the federal immigration and naturalization laws. Only defendants Provencal and Molvar are sued for money damages.

Plaintiffs seek also to represent a class of persons made up of American citizens, permanent residents and their alien spouses residing in the United States who have filed marriage petitions with the INS' District 2 office. Plaintiff, however, have not moved to certify a class and the difficult questions of whether their complaint states a claim which is appropriate for a class action and, if so, whether the Alis are properly representative plaintiffs are not before me today.

The INS has moved to dismiss the Alis' complaint for lack of subject-matter jurisdiction; failure to exhaust administrative remedies; ripeness; failure to state a claim on which relief can be granted; and official immunity. The parties briefed the legal questions raised by the INS' motion to dismiss the Alis' complaint with vigor and at great length. The INS filed a forty-nine page memorandum of law. In opposition, the Alis filed an eighty-five page memorandum of law, with appendices. Following oral argument, the Alis filed a ten-page supplemental memorandum which prompted an INS reply brief. While in the main helpful, much of this argumentation is unnecessarily prolix and serves to obscure the important issues involved. Unfortunately, this type of presentation requires this lengthy memorandum in kind. As this litigation proceeds the parties must sift and refine their arguments.

After carefully considering the pleadings and oral argument, and a particularly close reading of the decision in *Stokes v. INS*, 393 F.Supp. 24 (S.D.N.Y.1975), I am persuaded by some of the INS' contentions, but the principal claims survive, at least at this point, and this case will proceed on those claims.

I.

A.

To clarify the complaint, I begin with a brief sketch of the Immigration and Nationality Act (INA), 8 U.S.C. §§ 1101–1503 (1982), and its governing regulations.

Immediate relatives of United States citizens are exempt from the numerical quota restrictions on immigration set by the INA. 8 U.S.C. § 1151(a), (b).[1] Immediate rela-

---

1. Section 1151 provides:

(a) Exclusive of special immigrants defined in section 1101(a)(27) of this title, immediate relatives specified in subsection (b) of this section, and aliens who are admitted or granted asylum under section 1157 or 1158 of this title, the number of aliens born in any foreign state or dependent area who may be issued immigrant visas or who may otherwise acquire the status of an alien lawfully admitted to the United States for permanent residence, shall not in any of the first three quarters of any fiscal year exceed a total of seventy-two thousand and shall not in any fiscal year exceed two hundred and seventy thousand:

Provided, That to the extent that in a particular fiscal year the number of aliens who are issued immigrant visas or who may otherwise acquire the status of aliens lawfully admitted for permanent residence, and who are subject to the numerical limitations of this section, together with the aliens who adjust their status to aliens lawfully admitted for permanent residences pursuant to subparagraph (H) of section 1101(a)(27) of this title or section 19 of the Immigration and Nationality Amendments Act of 1981, exceed the annual numerical limitation in effect pursuant to this section for such year, the Secretary of State shall reduce to such extent the annual numerical

tives of permanent resident aliens, although subject to quotas, receive preference over all immigrants except the unmarried children of American citizens, and can usually secure an immigrant visa within a year. 8 U.S.C. § 1152(e)(1), (2). Other immigrants who are in lower preference categories, may have to wait as long as fifteen years to obtain an immigrant visa. *See* Note, *The Constitutionality of the INS Sham Marriage Investigation Policy,* 99 Harv.L.Rev. 1238, 1240 n. 13 (1986).

Section 204 of the INA, 8 U.S.C. § 1154, does not prescribe procedures to be followed in determining whether an alien is married to an American citizen or permanent resident. Rather, it delegates this authority to the Attorney General, who must decide "[a]fter an investigation of the facts in each case," whether preferential immediate relative status should be granted. 8 U.S.C. § 1154(b).[2] The Attorney General has, in turn, delegated this task to the INS.

The INS has adopted broad investigatory procedures to ferret out sham marriages, entered into solely for the purpose of circumventing the immigration law. 8 C.F.R. §§ 103.2, 204.1(a), 204.2(a) (1985). These procedures require the citizen or resident spouse to obtain approval from the INS of a petition, known as Form I–130, on behalf of the alien spouse. Marriages are scrutinized to determine a couple's intent at the time of their marriage, *see Lutwak v. U.S.,* 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed.2d 593 (1953), which is evaluated based on their testimony at a marriage interview and on their conduct as a couple after their marriage. Often the husband and wife are interviewed separately to check for discrepancies between their answers. U.S. Immigration & Naturalization Service, Examinations Handbook, III–13. The INS "often inquires whether the [alien] spouse's name appears on insurance policies, leases, income tax forms, or bank accounts." 1 C. Gordon & H. Rosenfeld, Immigration Law and Procedure, § 2.18a, at 2–153 (rev. ed. 1985). The INS may "ask questions about the couple's courtship, their wedding ceremony, the decor of their residence, the division of household chores, or what they had for breakfast on the morning of the interview." Note, 99 Harv.L.Rev. at 1242. Questions about a couple's sex life before

---

limitation in effect pursuant to this section for the following fiscal year.

(b) The "immediate relatives" referred to in subsection (a) of this section shall mean the children, spouses, and parents of a citizen of the United States: Provided, That in the case of parents, such citizen must be at least twenty-one years of age. The immediate relatives specified in this subsection who are otherwise qualified for admission as immigrants shall be admitted as such, without regard to the numerical limitations in this chapter.

8 U.S.C. § 1151.

2. Section 1154(a) and (b) provide:

(a) Any citizen of the United States claiming that an alien is entitled to a preference status by reason of a relationship described in paragraph (1), (4), or (5) of section 1153(a) of this title, or to an immediate relative status under section 1151(b) of this title, or any alien lawfully admitted for permanent residence claiming that an alien is entitled to a preference status by reason of the relationship described in section 1153(a)(2) of this title, or any alien desiring to be classified as a preference immigrant under section 1153(a)(3) of this title (or any person on behalf of such an alien), or any person desiring and intending to employ within the United States an alien entitled to classi-

fication as a preference immigrant under section 1153(a)(6) of this title, may file a petition with the Attorney General for such classification. The petition shall be in such form as the Attorney General may by regulations prescribe and shall contain such information and be supported by such documentary evidence as the Attorney General may require. The petition shall be made under oath administered by any individual having authority to administer oaths, if executed in the United States, but, if executed outside the United States, administered by a consular officer or an immigration officer.

(b) After an investigation of the facts in each case, and after consultation with the Secretary of Labor with respect to petitions to accord a status under section 1153(a)(3) or 1153(a)(6) of this title, the Attorney General shall, if he determines that the facts stated in the petition are true and that the alien in behalf of whom the petition is made is an immediate relative specified in section 1151(b) of this title or is eligible for a preference status under section 1153(a) of this title, approve the petition and forward one copy thereof to the Department of State. The Secretary of State shall then authorize the consular officer concerned to grant the preference status.

8 U.S.C. § 1154(a), (b).

and after their marriage are not uncommon. Id. at 1242–43. Neither the INA nor its regulations, however, provide for an evidentiary hearing prior to the INS' determination of whether a marriage is genuine.

If the marriage petition is approved, the alien spouse must apply for "adjustment of status" to "alien lawfully admitted for permanent residence." 8 U.S.C. § 1255.[3] A couple typically files the marriage petition and the application for adjustment simultaneously.

### B.

Turning next to the Alis' complaint, it is accepted that the facts alleged there must be construed in the light most favorable to the Alis and taken as admitted for purposes of this motion to dismiss, *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Demars v. General Dynamics Corp.,* 779 F.2d 95, 100 (1st Cir.1985), and also that the Alis' complaint will not be dismissed for failure to state a claim "unless it appears beyond doubt that the [Alis] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

Mohamed Abdi Ali, a twenty-eight year old Somalian citizen, was admitted to the United States in November, 1980, as a non-immigrant student, authorized to stay until June 15, 1982. On June 25, 1982, Ali married a natural born American citizen, Yolanda Odessa Cunningham, in a civil ceremony held in Boston.

The Alis filed a marriage petition and an application for adjustment of status on September 10, 1982. An INS examiner who spoke with the Alis was skeptical of their marriage. In the investigation which followed, INS officials spoke to the manager of an apartment building listed by the Alis' as their residence; to a neighbor; to Mohamed Alis; and, to two of his roommates. The investigators concluded that the Alis' marriage was a sham.

After several postponements, the Alis appeared at the District 2 INS office in Boston on September 16, 1984, accompanied by their attorney, Harvey Kaplan, for a marriage interview.

The INS examiner first proposed a visit to the Alis' residence, and the Alis agreed. Two INS investigators, Provencal and Molvar, took the Alis in an INS car. The Alis say that as a ploy to separate them, their attorney was not allowed to ride with them. Kaplan told the investigators not to speak to the Alis.

Once alone with the Alis, however, Yolanda Ali stated that the INS investigators yelled at her, warning her she faced jail if she did not admit that her marriage was a sham. Frightened, Yolanda Ali admitted that she lived at her mother's house several days each week; her mother has custody of Yolanda Ali's six year old daughter. Mohamed Ali was immediately arrested, handcuffed and returned to the INS office.

---

**3.** Section 1255 provides:

(a) The status of an alien who was inspected and admitted or paroled into the United States may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.

(b) Upon the approval of an application for adjustment made under subsection (a) of this section, the Attorney General shall record the alien's lawful admission for permanent residence as of the date the order of the Attorney General approving the application for the ad-

justment status is made, and the Secretary of State shall reduce by one the number of the preference or nonpreference visas authorized to be issued under sections 1152(e) or 1153(a) of this title within the class to which the alien is chargeable for the fiscal year then current.

(c) The provisions of this section shall not be applicable to (1) an alien crewman; (2) an alien (other than an immediate relative as defined in section 1151(b) of this tile or a special immigrant described in section 1101(a)(27)(H) of this title) who hereafter continues in or accepts unauthorized employment prior to filing an application for adjustment of status; or (3) any alien admitted in transit without visa under section 1182(d)(4)(C) of this title.

8 U.S.C. § 1255.

Questioning of Yolanda Ali continued and she was told to avoid Kaplan. She signed an affidavit which stated that Mohamed Ali offered her $1,000.00 to marry him and that she had never lived with him. She also signed an INS form withdrawing her marriage petition on behalf of Mohamed Ali. When Kaplan arrived, she refused to speak to him.

Three months later, in December, 1984, Yolanda Ali filed a second marriage petition on behalf of Mohamed Ali, and an affidavit explaining that she was confused and nervous when she withdrew her first petition. At the same time, Mohamed Ali filed a renewed application for adjustment of status. Deportation proceedings against Mohamed Ali were continued pending a decision on Yolanda Ali's marriage petition.

A marriage interview was scheduled for June 25, 1985. Kaplan tried unsuccessfully before the hearing to get copies of all documents the INS examiner would use in judging the marriage petition. At the hearing, the INS examiner questioned Yolanda Ali for twenty five minutes, but refused to take testimony from witnesses, including Yolanda Ali's mother, her daughter, and a roommate who lives with Mohamed Ali. No written transcript or recording was made.

Several weeks after the marriage interview, the Alis' counsel, in response to his Freedom of Information Act request, received some documents from the INS. Sixteen pages were withheld, and three pages partially withheld. He asked to reopen the marriage interview to rebut information in the documents; asked that Yolanda Ali's affidavit, signed in September, 1984, be excluded from the record; and asked to be allowed to depose the INS investigator who took the statement. Kaplan received no response.

The INS has not reached a decision on Yolanda Ali's marriage petition.

## II.

■ The Alis correctly assert that this Court has jurisdiction to hear their claims under its general federal question jurisdiction, 28 U.S.C. § 1331 (1982), and its specific jurisdiction over claims arising under the INA, 8 U.S.C. § 1329. Section 1329 provides that "[t]he district courts ... shall have jurisdiction of all causes, civil and criminal, arising under any of the provisions of this subchapter of the INA." Sections 1151(b), 1153(a)(2), 1154, 1225 and 1357, the INA provisions at issue in the Alis' complaint, are all within the relevant subchapter. *See Stokes v. INS*, 393 F.Supp. at 27–28 (S.D.N.Y.1975); *Haidar v. Coomey*, 401 F.Supp. 717, 719 (D.Mass. 1974), *appeal denied sub nom., Haidar v. INS*, 530 F.2d 962 (1st Cir.1976).

While conceding this Court's jurisdiction over Yolanda Ali's claims, the INS contends that this Court lacks jurisdiction to postpone Mohamed Ali's deportation proceedings while this action is pending because of the INA's grant of exclusive jurisdiction to review final orders of deportation vested in the courts of appeal. 8 U.S.C. § 1105a(a). The INS mischaracterizes Mohamed Ali's effort to enjoin deportation proceedings as an attack on a final order of deportation, however, and its argument is unavailing.

In 1961, Congress limited the review of final orders of deportation to the appropriate court of appeals. 8 U.S.C. § 1105a(a); [4] *see Haitian Refugee Center v. Civiletti*, 676 F.2d 1023, 1032–33 (5th Cir.1982). Disturbed by the misuse of judicial review by aliens seeking to stave off deportation indefinitely, Congress vested exclusive review of deportation orders in the courts of appeal "to expedite the deportation of undesirable aliens by preventing successive dilatory appeals to various federal courts." *Foti v. INS*, 375 U.S. 217, 226, 84 S.Ct. 306, 312, 11 L.Ed.2d 281 (1963).

---

4. Section 1105a(a) provides in pertinent part:

The procedure prescribed by, and all the provisions of Chapter 158 of Title 28 shall apply to, and shall be the sole and exclusive procedure for, the judicial review of all final orders of deportation heretofore or hereafter made against aliens within the United States pursuant to administrative proceedings under section 1252(b) of this title or comparable provisions of any prior Act ...

8 U.S.C. § 1105a(a).

The Supreme Court, however, rejected expansive interpretations of the statute's "final order of deportation" language in *Cheng Fan Kwok v. INS*, 392 U.S. 206, 212, 88 S.Ct. 1970, 1974, 20 L.Ed.2d 1037 (1968), in which it held that a petition seeking review of an INS denial of a stay of deportation is not within the section 1105a jurisdictional grant to the courts of appeal. Section 1105a, the Court observed, is "a jurisdictional statute [and] it must be construed both with precision and with fidelity to the terms by which Congress has expressed its wishes." *Id.* "Congress quite deliberately restricted the application of § 106(a) [8 U.S.C. § 1105a] to orders entered during proceedings conducted under § 242(b) [8 U.S.C. § 1252(b)], or directly challenging deportation orders themselves." *Id.* at 215, 88 S.Ct. at 1975–76. Therefore, the Court held, "the judicial review provisions of § 106(a) embrace only those determinations made during a proceeding conducted under § 242(b) including those determinations made incident to a motion to reopen such proceedings." *Id.* at 216, 88 S.Ct. at 1976. A stay of deportation is purely discretionary relief external to the deportation hearings. A petition seeking review of a denial of a stay is thus not an attack upon the proceeding in which the deportation order was entered. The alien should have sought judicial relief in the appropriate district court. *Id.* at 210, 88 S.Ct. at 1973. *See* Note, *Jurisdiction to Review Prior Orders and Underlying Statutes in Deportation Appeals*, 65 Va.L. Rev. 403 (1979).

Applying *Chen Fan Kwok*, in cases that did not challenge directly a final order of deportation, an order entered in the course of their deportation hearings, or the denial of a motion to reopen deportation proceedings, a number of circuit courts have held that they lack initial jurisdiction under the judicial review provisions of the INA. For example, in *Dastmalchi v. INS*, 660 F.2d 880 (3d Cir.1981), the Third Circuit was asked by Iranian students found deportable by the INS to strike down as unconstitutional the INS regulations which led to discovery of their illegal immigration status. The *Dastmalchi* Court, after an exhaustive analysis of *Cheng Fan Kwok*, concluded that section 1105a did not vest initial jurisdiction in the courts of appeal to review attacks on the constitutionality of a statute or a regulation underlying an alien's deportation order. Neither an immigration judge nor the Board of Immigration Appeals (BIA) in the course of a section 242(b) deportation proceeding could enter an order voiding the alien students' deportation in response to their constitutional objections. *Id.* at 886. Consequently, "even though resolution of that issue in the aliens' favor might directly affect the execution of" their final orders of deportation, the students' constitutional challenge had to be heard initially in a district court. *Id.* *See also Jaa v. INS*, 779 F.2d 569, 570–71 (9th Cir.1986) (district court, not the court of appeals, has jurisdiction to review INS' denial of status adjustment application and to enjoin alien's deportation because the status determination issue is ancillary to the final order of deportation); *Andres v. INS*, 460 F.2d 287 (6th Cir.1972) (court of appeals lacked initial jurisdiction to review INS' refusal to revalidate alien's teaching visa because in challenging the INS' decision as an unconstitutional denial of due process the alien raised an issue collateral to a final order of deportation).

Inversely, a number of district courts have asserted jurisdiction notwithstanding section 1105a over cases affecting deportation proceedings, but which did not challenge final orders of deportation or orders entered in the course of deportation proceedings. In *Haidar v. Coomey*, 401 F.Supp. at 717, for example, an alien sued seeking injunctive relief against a final order of deportation on the ground that the section 242(b) deportation hearing violated his procedural due process rights. The *Haidar* Court invoking its general federal question jurisdiction issued the injunction over the INS' jurisdictional objection. The alien's suit was a "collateral attack on the proceedings, an attack which goes behind the hearing and challenges the underlying procedures," and so jurisdiction was not exclusively in the appropriate court of appeals. *Id.* at 719. *See also Papakonstan-*

*tinou v. Civiletti,* 496 F.Supp. 105, 107 (E.D.N.Y.1980) (district court has jurisdiction to entertain attacks on constitutionality of INA's immediate relative status provisions raised by alien subject to final order of deportation even though its decision could "effectively control whether or not a given alien will be deported").

Nothing in the Alis' complaint can reasonably be taken as an attack on Mohamed Ali's deportation proceedings, or on an order entered during those proceedings. And since the INS has not ordered him deported, the present action can hardly be considered an attack on a final order of deportation. Nonetheless, the INS argues that Mohamed Ali's concern here is not Yolanda Ali's marriage petition, but his application for adjustment status. It is true that if Mohamed Ali's application is denied and deportation proceedings against him are renewed, he will again be able to raise the issue of his marriage to an American citizen. If a final order of deportation were entered, Mohamed Ali could seek review of both the deportation order and the denial of adjustment in status in the court of appeals. *Nasan v. INS,* 449 F.Supp. 244, 246 (N.D.Ill.1978).

But the Alis' complaint challenges the INS' procedures for handling marriage petitions and raises matters collateral to a deportation order. Mohamed Ali would not be allowed to challenge the INS' conduct during Yolanda Ali's marriage petition proceedings at his deportation hearing, on review by the BIA or on appellate review in the court of appeals. *Conti v. INS,* 780 F.2d 698, 701–702 (7th Cir.1985); *Elbez v. INS,* 767 F.2d 1313, 1314 (9th Cir.1985); *Sadegh-Norbari v. INS,* 676 F.2d 1348,

1350 (10th Cir.1982); *Stokes* 393 F.Supp. at 28.

Mohamed Ali does not ask this Court to declare him non-deportable, or to permanently enjoin deportation proceedings against him. Rather, as the beneficiary of a marriage petition, he asks this Court to postpone deportation proceedings, already continued on the INS' own initiative, until the INS reconsiders Yolanda Ali's marriage petition according to constitutionally-sound procedures.[5] While this injunctive relief, if granted, could postpone deportation proceedings for some time, it does not amount to a attack on a final order of deportation reviewable only in the courts of appeal and, therefore, this Court has jurisdiction.

## III.

■ The INS contends that this Court lacks subject matter jurisdiction because the Alis have raised unripe claims and have not exhausted administrative remedies still available to them. The district director has not decided Yolanda Ali's marriage petition or Mohamed Ali's status adjustment application. Until he does, the INS argues, judicial review will involve "hypothesis and conjecture" and will be premature. Even if the district director denies the marriage petition or the status adjustment application, the INS argues, the Alis will have administrative remedies which must be exhausted before this Court considers their claims. Neither argument is persuasive.

### A.

The INS' ripeness argument fails because the Alis challenge the way the INS makes decisions, not the decisions them-

---

5. The INS suggested at oral argument, though it did not raise the issue in its motion to dismiss or the accompanying memorandum of law, that Mohamed Ali lacks standing to challenge the INS' handling of his wife's marriage petition. The INS' reliance on *Pacheco-Pereira v. INS,* 342 F.2d 422 (1st Cir.1965) is, however, inapposite. *Pacheco-Pereira* held that an alien does not have a right to preferential immigrant status once a marriage petition filed on their behalf is withdrawn. Similarly, an alien does not obtain a vested right upon approval of a marriage petition. *Wright v. INS,* 379 F.2d 275, 276 (6th Cir.1967). Thus, "a citizen who files a visa

petition has a right to withdraw it and upon notice of withdrawal to the Service, revocation of approval is automatic." *Id.* at 276.

Those decisions do not dispose of the issue whether an alien has standing to challenge the INS' procedures for handling an active marriage petition filed on his or her behalf. Clearly, such an alien has a "valuable right at stake" in the marriage petition process, *Stokes,* 393 F.Supp. at 29. Whether an alien has standing to challenge INS procedures if a marriage petition filed on his or her behalf is withdrawn and not refiled is a question I need not address.

selves. The Alis attack the constitutionality of the INS' procedure for investigating and adjudicating marriage petitions; they do not contest a denial of Yolanda Ali's marriage petition, or of Mohamed Ali's application for adjustment in status.

The ripeness doctrine spares federal courts from trying to resolve abstract, speculative and contingent disputes. In cases challenging administrative agency action such as this one, the ripeness doctrine keeps courts "from entangling themselves in abstract disagreements over administrative policies, and also ... protect(s) the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way." *Lee Pharmaceuticals v. Kreps,* 577 F.2d 610, 618 (9th Cir.), *cert. denied,* 439 U.S. 1073, 99 S.Ct. 847, 59 L.Ed.2d 40 (1978). *See Haitian Refugee Center v. Civiletti,* 503 F.Supp. 442, 469 (S.D.Fla.1980), *aff'd sub nom., Haitian Refugee Center v. Smith,* 676 F.2d 1023 (5th Cir.1982).

The INS' marriage petition procedure, however, is not a newly-adopted and not-yet enforced set of agency regulations. *See, e.g., Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–51, 87 S.Ct. 1507, 1515–17, 18 L.Ed.2d 681 (1967). The Alis complain about the manner in which they have already been treated by the INS pursuant to well-established INS policy, not about how they fear they might be treated. If the INS grants Yolanda Ali's marriage petition her claim that the INS' marriage petition procedures violated her fifth amendment procedural due process rights will not be affected. Moreover, the Alis seek to represent a class of persons who have filed or will file marriage petitions with the INS and whose petitions will be handled in the same way as the Alis. Even if the INS grants Yolanda Ali's petition, the claims of the other class members will not be affected.

Mootness, not ripeness, is the INS' apparent concern; that is, if Yolanda Ali's marriage petition is granted, she will no longer have a claim. Of course, because the INS has not decided Yolanda Ali's marriage petition, the mootness issue is not yet ripe, and I will not speculate on that issue when it is not before me.

### B.

Next, the INS contends that Yolanda Ali's marriage petition is subject to further INS action, and that her procedural claims are not subject to judicial review until she exhausts available administrative remedies. It is true that if the district director denies the petition, Yolanda Ali can appeal to the BIA, 8 C.F.R. § 204.1(a), and then to the district court. Similarly, if deportation proceedings against Mohamed Ali are not enjoined, and the immigration judge denies his application for adjustment in status, that decision can be appealed to the BIA, and then to the court of appeals. However, the Alis attack the constitutionality of the INS' administrative procedures not the INS' decisions, and the INS' exhaustion argument is unavailing.

Administrative remedies generally must be exhausted before a party resorts to the courts to challenge agency action. Exhaustion advances several policies. It (1) allows the agency to develop a more complete factual record; (2) permits the exercise of agency discretion and expertise on issues requiring this; (3) prevents deliberate disregard of established agency procedure; and (4) enhances judicial efficiency by giving the agency the first opportunity to correct any error. *Haitian Refugee Center,* 676 F.2d at 1034. *See also McKart v. United States,* 395 U.S. 185, 193–95, 89 S.Ct. 1657, 1662–63, 23 L.Ed.2d 194 (1969).

Refusing to hear the Alis' claims until they have pursued appeals to the BIA would force them to exhaust an administrative procedure they attack as unconstitutional, and would advance none of the policies underlying the exhaustion rule. First, the factual record as concerns the INS' marriage investigation procedures in general, and the handling of the Alis' marriage petition in particular, is complete. Save for the district director's decision, the INS has fully processed Yolanda Ali's marriage petition. Second, pursuit of the administrative procedures would not give the Alis

what they seek in this action. Yolanda Ali says she did not get a fair hearing on her marriage petition. An appeal would not give her a *de novo* hearing. *See Stokes,* 393 F.Supp. at 28. Moreover, Mohamed Ali could not attack the constitutionality of the marriage petition process in this deportation proceeding, and no further record will be developed on this procedural issue in that proceeding. *Elbez,* 767 F.2d at 1314. Third, there is no issue raised in the Alis' complaint on which the INS possesses particular expertise. The Alis' allege that the INS marriage petition procedures violate due process rights of American citizens and their alien spouses. This is a legal issue, not a question of immigration policy.

Finally, the Alis seek remedies which the INS, on its own, either cannot or will not give them. The Alis seek a sweeping revision of the INS marriage petition procedures. The INS could, of course, adopt such revisions on its own, but internal agency review of a single substantive claim to entitlement is unlikely to resolve constitutional attacks on the agency's own procedures. *See Haitian Refugee Center,* 676 F.2d at 1034.

This Court has subject matter jurisdiction without regard to any claimed necessity to exhaust administrative proceedings.

## IV.

Next, the INS argues that the Alis' complaint should be dismissed because it fails to state a cognizable claim. The Alis claim that the INS' procedures violated their fifth amendment procedural due process rights. Specifically, they say their counsel was unable to adequately represent them because INS officials concocted to interrogate Yolanda Ali out of her lawyer's presence; that they were not allowed to review the full record before the June, 1985 marriage interview; that INS investigators communicated secretly with the INS examiner who will rule on their marriage petition; that they were not given an opportunity to rebut derogatory information in the administrative record; that they were not allowed to present witnesses at the marriage interview, or to cross-examine witnesses; and, that no transcript of the hearings was kept. Many of these, the Alis assert, are violations of the INS' own regulations.

The Alis also attack the INS' investigatory procedures. Yolanda Ali's fifth amendment privilege against self-incrimination was violated, the Alis argue, when she was coerced into admitting that she had entered into a sham marriage for money.

Finally, the Alis argue that the INS' marriage petition procedures permit unjustified governmental intrusion into intimate, constitutionally protected areas of marriage.

## A.

■ I take these last two first. The Alis err when they argue that the INS agents coerced a self-incriminating statement during an investigation which has both civil and criminal implications, and so violated Yolanda Ali's fifth amendment privilege against self-incrimination. The marriage petition process is not the commencement of a criminal prosecution; it is an investigatory step in a civil proceeding initiated by the petitioner and the beneficiary spouse. *Stokes,* 393 F.Supp. at 30–31; *see also Navia-Duran v. INS,* 568 F.2d 803, 807–808 (1st Cir.1977). Accordingly, the protections afforded an accused facing custodial interrogation or a critical stage in a prosecution are not called for here.

The Alis might face criminal charges if the INS determines they married for the purpose of misleading the INS. But the Alis' objection is to the INS' use of Yolanda Ali's withdrawn marriage petition and accompanying affidavit in deciding her marriage petition, and not to the possible criminal consequences. Yolanda Ali's affidavit, she contends, was involuntary, a confession coerced from her when she was confused, scared and misled by INS investigators. While Yolanda Ali does not raise a cognizable compelled self-incrimination claim, she does, I must conclude, state a procedural due process claim.

■ The use of involuntary statements in deportation proceedings is an impermissible violation of procedural due process

rights, and the "absence of [*Miranda*] warnings [is] a relevant factor in assessing the question of voluntariness." *Navia-Duran*, 568 F.2d at 809. In *Navia-Duran* the First Circuit reversed a deportation order which was based on an alien's coerced admission, not because the alien had not been given *Miranda* warnings, but because the statement was involuntary and its use by the INS violated the alien's right to due process at a deportation hearing. *Id.* at 810. *See Perez-Funez v. INS*, 619 F.Supp. 656, 659, 660 n. 9, 661–63 (C.D.Cal.1985); *Orantes-Hernandez v. Smith*, 541 F.Supp. 351, 376–78 (C.D.Cal.1982).

■ Procedural due process requires fairness in marriage petition proceedings. *Stokes*, 393 F.Supp. 28. *See* discussion at note 6, *infra*. Yolanda Ali has a liberty interest in her marriage. *Board of Regents v. Roth*, 408 U.S. 564, 572, 92 S.Ct. 2701, 2706–07, 33 L.Ed.2d 548 (citing *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626–27, 67 L.Ed. 1042 (1923)). Mohamed Ali, as an alien in the United States, also has procedural due process rights. *Stokes*, 393 F.Supp. at 29; *Au Yi Lau v. INS*, 445 F.2d 217, *cert. denied*, 404 U.S. 864, 92 S.Ct. 64, 30 L.Ed.2d 108 (1971), and has an undeniable stake in the marriage petition. Accepting as true the claim that Yolanda Ali's statement was involuntary, and that the INS will rely on it in deciding her marriage petition, I must conclude that she has stated a claim for violation of her fifth amendment due process rights.

### B.

Next, the Alis contend that the INS' marriage petition procedures interfered with their liberty interest in their marriage. It is difficult to determine precisely what the Alis mean. They might mean that the Alis' have a constitutionally protected liberty interest in their marriage and the INS must afford them procedural due process in determining the marriage petition. That is certainly true, but the INS does not dispute the Alis' right to due process. Whether the INS' procedures afforded the Alis and similarly situated persons due process is discussed below in section IV–C of this memorandum.

■ It is possible, however, that the Alis have something more provocative in mind, that is, that the INS' marriage investigation procedures intrude on a zone of marital and familial privacy which the state cannot enter without a compelling justification. *See Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *see also Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983); *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). The right to privacy enunciated in *Griswold* protects both the interest in having control over such important matters as marriage, procreation and contraception, and the interest in avoiding disclosure of intimate, personal matters. *Whalen v. Roe*, 429 U.S. 589, 599, 600 n. 26, 97 S.Ct. 869, 876–77 n. 26, 51 L.Ed.2d 64 (1977).

The Alis might contend that the INS impermissibly judges marriages by normative standards of what constitutes a marriage, and thus interferes with a couple's decisions about highly personal matters such as the amount of time spent together, sexual behavior and the decision to have children. *See Bark v. INS*, 511 F.2d 1200, 1201 (9th Cir.1975). Or, the Alis might argue that the INS invaded their marital privacy by asking unduly intrusive questions about intimate matters. *See Chan v. Bell*, 464 F.Supp. 125 (D.D.C.1978).

■ However, neither of these contentions is supported by factual allegations in the Alis' complaint. The complaint does not allege that the INS will deny Yolanda Ali's marriage petition because her marriage does not conform to some INS norm for "genuine" marriages. Nor does the complaint establish that the marriage investigation and hearing forced the Alis to disclose such highly intimate matters such as their method of birth control or their sexual conduct before and after marriage. Thus, to the extent the Alis have attempted to state a claim on the ground that the INS intruded impermissibly into their marriage, they have not succeeded, and their claim

that the INS interfered with their liberty interest in their marriage is dismissed.

### C.

Finally, the Alis contend that the INS marriage petition procedures violated their fifth amendment right to procedural due process. First, they say the INS failed to follow its own regulations in handling Yolanda Ali's marriage petition, a due process violation in itself. Second, they say the statutory and regulatory scheme controlling the INS' marriage investigation procedure is unfair because it provides no opportunity for confrontation or cross-examina-

tion of adverse witnesses, and minutes of the hearings are not transcribed. As noted above, in section IV–A of this memorandum, the Alis have already sufficiently alleged a due process violation because the INS uses allegedly involuntary statements against petitioners.

■ The INS does not dispute that the Alis, and other marriage petitioners and their alien spouses who are the beneficiaries of the petitions, have interests safeguarded by the fifth amendment protection from deprivation without due process of law.[6] *See Stokes,* 393 F.Supp. at 29; *Hai-*

---

**6.** Since the INS agrees that the Alis, and other marriage petitioners and their spouses, are entitled to procedural due process the parties have not given much attention to the source of the Alis' constitutionally-protected interest. Procedural due process, of course, "is not itself an independent right, but merely the condition precedent to the deprivation of a life, liberty or property interest." *Haitian Refugee Center,* 676 F.2d at 1037.

The Alis have two intertwined constitutionally protected interests threatened by the INS' allegedly unfair handling of marriage petitions. First, there is the Alis' liberty interest in their marriage itself and the entitlements that accompany that status. *Stokes,* 393 F.Supp. at 29. Certainly when the government undertakes to investigate and pronounce on the validity of a person's marriage it threatens an aspect as fundamental as the couple's decisions about contraception and procreation and private sexual behavior. This interest originates in the Constitution itself. *See, e.g., Akron v. Akron Center for Reproductive Health, Inc.,* 462 U.S. 416, 427, 103 S.Ct. 2481, 2490–91, 76 L.Ed.2d 687 (1983). Second, the Alis have a constitutionally-protected interest in the right to petition the government to have Yolanda Ali's alien spouse declared her immediate relative, and ultimately to secure the preferential immigration treatment that goes with that statute. Congress has noted its commitment to family unity in adopting the immediate relative preference. H.R.Rep. No. 1365, 82d Cong., 2d Sess. 37, 38, *reprinted in* 1952 U.S.Code Cong. & Ad.News 1691, 1692. Americans married to aliens should not, Congress decided when it passed the INA, have their marriages burdened by the accidents of citizenship. Immediate relative status is not a discretionary government entitlement. Once the INS determines that an alien is married to an American citizen, or a permanent resident alien, it must grant immediate relative status. Thus, Congress at a minimum has created in the American citizen and the beneficiary alien spouse the right to submit and substantiate their marriage, and this entitlement invokes the guarantee of due process. *Cf. Haitian Refugee Cen-*

*ter,* 676 F.2d at 1038–39 (right to petition the INS for political asylum is constitutionally-protected liberty or property interest triggering due process guarantee even though grant of that benefit is discretionary and there is no constitutionally-protected right to political asylum itself).

*Haitian Refugee Center* is not limited by the Eleventh Circuit's en banc decision in *Jean v. Nelson,* 727 F.2d 957 (11th Cir.1984) which was affirmed in *Jean v. Nelson,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985).

The *Haitian Refugee Center* case was brought by a class of over 4,000 Haitians in south Florida who had sought political asylum in the United States. The Fifth Circuit found that in an attempt to cope with a backload of cases, INS officials had deliberately "created conditions which negated the possibility that a Haitian's asylum hearing would be meaningful in either its timing or nature." *Haitian Refugee Center,* 676 F.2d at 1040. Although it observed that even aliens who have entered this country unlawfully and face deportation have a liberty interest and are "assured the protections of the fifth amendment due process clause," *id.* at 1036, the court did not decide that this same liberty interest "is implicated in the context of asylum proceedings." *Id.* at 1037 n. 30. Rather, the court held that Congress had created a constitutionally-protected right to petition the government for political asylum. *Id.* at 1038. By deviating from its own regulations and procedures, promulgated pursuant to congressional delegation of authority to the Attorney General, the INS effectively denied the right to petition for political asylum. *Id.* at 1040.

*Jean* was a class action brought on behalf of unadmitted Haitian aliens who were detained at INS facilities in south Florida pending decisions on their petitions for political asylum. Before 1981 the INS had followed a general policy, pursuant to 8 U.S.C. § 1182(d)(5)(A), of general parole for aliens seeking admission to the United States. In 1981, however, the Attorney General, concerned with the large numbers of Haitian and Cuban aliens arriving in south Florida,

*tian Refugee Center*, 676 F.2d at 1037–38. The INS insists, however, that it followed its regulations and that due process does not require the elaborate and time-consuming hearing sought by the Alis.

The Alis contend that the INS did not follow its own regulations, including those that provide the right to counsel, 8 C.F.R. § 292.5(b); the right to inspect the complete record of the proceedings, 8 C.F.R. § 103.2(b)(2), 292.4(b); that the district director's decision be based only on the record, 8 C.F.R. § 103.2(b)(2); the opportunity to rebut derogatory information in the record, 8 C.F.R. § 103.2(b)(2); and, the right to call and cross-examine witnesses, 8 C.F.R. § 292.5(b).

While the INS' regulations and operating procedures "do not necessarily exhaust the requirements of due process," *Haitian Refugee Center*, 503 F.Supp. at 456, departures from them "must be studied quite closely since such departures, especially if willful, systematic, and cumulative, may amount to a breach of the fundamental fairness which due process guaran-

tees." *Id.* at 455. It is true that "[t]he contours of the due process clause are too deeply rooted in lasting constitutional principles to depend upon administrative regulations for the specific protection the clause affords." *United States v. Floulis*, 457 F.Supp. 1350, 1354 (W.D.Pa.1978). But that means only that the INS' regulations and operating procedures are not the sole measure of what process is due marriage petitioners and their alien spouses. The adequacy of statutory and regulatory procedures for deprivation of a liberty or property interest, even one that is statutorily created, must be analyzed in constitutional terms. *See Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed.2d 681 (1954); *Bridges v. Wixon*, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed.2d 2103 (1945). Still, if the INS systematically ignores its own procedures as the Alis have alleged, that is enough, at least for purposes of this motion, to state a claim. *Navia-Duran*, 568 F.2d at 808–809 (compliance with INS regulations is an "essential safeguard of an alien's right to due process").[7]

ordered the INS to detain without parole immigrants unable to make out a prima facie case for admission. Pending a decision on their admission or exclusion, the aliens were detained.

Plaintiffs contended that the new restrictive parole policy did not comply with the notice-and-comment rulemaking procedures of the Administrative Procedure Act (APA), 5 U.S.C. § 553, and that it violated the equal protection guarantee of the fifth amendment because it discriminated against black and Haitian aliens.

The Eleventh Circuit held the APA claim mooted because the INS had adopted new regulations in accordance with the APA. *Jean*, 727 F.2d at 962. Turning to the equal protection claim, the court held that the fifth amendment did not apply to the consideration of unadmitted aliens for parole. Although the court went on to remand the case to the district court to review the INS officials' exercise of discretion under the new nondiscriminatory parole regulations, the important issue here is the Eleventh Circuit's discussion of procedural due process.

An alien's right to procedural due process, the court held, turns on whether the alien is an excludable alien, one who has reached the border but has not been formally admitted, or a deportable alien, one who has succeeded in effecting an entry into the United States, even if his presence in this country is illegal. *Id.* at 961 n. 1, 967. Deportable aliens are entitled to due process under the fifth amendment, particularly

when the INS seeks to deport them. *Id.; see Kaoru Yamataya v. Fisher [The Japanese Immigrant Case]*, 189 U.S. 86, 23 S.Ct. 611, 47 L.Ed. 721 (1903). Excludable aliens seeking admission to the United States "have no constitutional rights with regard to their applications and must be content to accept whatever statutory rights and privileges they are granted by Congress." *Jean*, 727 F.2d at 968.

Because the Haitian aliens in *Haitian Refugee Center* were excludable aliens seeking admission based on a grant of political asylum their due process rights had their source in the INA's provision for political asylum. *Jean* points this out carefully and repeatedly. *Id.* at 976 n. 27, 981–82 & n. 34. This, however, only reiterated what the *Haitian Refugee Center* court had already explained, that is, that its procedural due process analysis was triggered by the congressionally-granted right to petition, not some more general constitutionally-based liberty interest. Thus, while *Jean* might illuminate *Haitian Refugee Center* it does not overrule it or limit its holdings.

Of course, since Mohamed Ali lawfully entered the United States on a student visa he must be considered a deportable, rather than an excludable alien, according to the *Jean* analysis and entitled to fifth amendment due process rights.

7. The decision in *United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979) is

With only one exception, the INS concedes that its regulations provide the procedural rights the Alis contend were denied to them. The INS insists, however, that its officials obeyed those regulations, and that the Alis received every procedural right to which they were entitled.

Whether that is true, however, is a matter of fact not now before this Court. The sole issue before me is whether the Alis have alleged sufficient facts which, if believed, would prove that the INS did not follow its own regulations in handling Yolanda Ali's marriage petition. I must conclude that they have.

■ First, the Alis allege that the INS refused to permit an inspection of the complete record before the June 25 hearing, and when it did furnish their attorney with a copy of the record, substantial portions were deleted. Second, the Alis allege that the investigators assigned to her petition communicated ex parte with the examiner assigned to decide her petition, a claim the INS denies. Third, the Alis allege that they have not been given a chance to rebut derogatory information. The INS says that every piece of documentary evidence submitted by the Alis was made part of the record. These allegations are obviously factual. I cannot decide them on the basis of the pleadings and briefs. I am satisfied, however, that the Alis have alleged them sufficiently to survive a motion to dismiss.

■ Finally, the Alis say section 292.5 of the INS regulations also provide marriage petitioners with the right to counsel and the right to cross-examine and present witnesses. 8 C.F.R. § 292.5. The INS says the Alis misread the regulations, which actually provides those procedural rights only at exclusion and deportation hearings.

Section 292.5(b) provides that "[w]henever an examination is provided for in this chapter, the person involved shall have the right to be represented by an attorney or representative who, except [for preliminary examinations on petitions for naturalization] shall be permitted to examine or cross-examine such person and witnesses, to introduce evidence, to make objections which shall be stated succinctly and entered on the record, and to submit briefs." 8 C.F.R. § 292.5(b). This regulation interprets section 292 of the INA, 8 U.S.C. § 1362, which provides that "[i]n any exclusion or deportation proceedings before a special inquiry officer and in any appeal proceedings before the Attorney General from any such exclusion or deportation proceedings, the person concerned shall have the privilege of being represented ... by such counsel ... as he shall choose." 8 U.S.C. § 1362.

The Alis seize on the regulation's "whenever an examination is provided" language, arguing that it includes marriage petition hearings. The regulations, they say, does not define an examination; since the Alis' marriage interviews were conducted by INS examiners, the Alis conclude, they were examinations. Though the syllogism has a superficial appeal, I must conclude that it is at odds with the statutory authority under which section 292.5(b) was promulgated.

The regulation is promulgated under the general delegation of authority to the Attorney General to enforce the INA, 8 U.S.C. § 1103, and specifically implements that portion of the INA which grants the right to be represented by counsel, at no

---

not to the contrary. In *Caceres* the Court held that tape recordings of a taxpayer's attempts to bribe an Internal Revenue Service (IRS) agent were properly admitted at his criminal trial even though they were obtained in violation of the IRS' regulations. The IRS' failure to comply with its own regulations implicated no procedural due process interest, and the exclusionary rule was not an applicable remedy. The *Caceres* Court distinguished the IRS' regulations, however, from cases, such as this one, where "compliance with the regulation is mandated by

the Constitution or federal law." *Id.* at 749, 99 S.Ct. at 1470. The Court cited *Bridges v. Wixon* where the Court "held invalid a deportation ordered on the basis of statements which did not comply" with INS procedural regulations "finding that the rules were designed to afford the alien due process of law by providing safeguards against essentially unfair procedures." *Id.* The INS was constitutionally compelled to adopt procedures that assured aliens would be treated fairly, and courts are bound to enforce those agency regulations. *Id.*

expense to the government, at exclusion and deportation hearings. 8 U.S.C. § 1362. This is clear also from the INA's legislative history. *See* H.R.Rep. No. 1365, 82d Cong. 2d Sess. 57 (1952), *reprinted in* 1952 U.S. Cong. & Ad.News 1653, 1710–13. The INS did confuse matters by conceding in its initial memorandum in support of its motion to dismiss that the regulation cited by the Alis did, in fact, grant marriage petitioners the right to counsel; only in its later reply memorandum did the INS retrench, arguing that section 292.5(b) applies only to exclusion and deportation proceedings, not marriage petitions. But the INS' careless briefing cannot create statutory authority where Congress has not acted. I must conclude that neither the INA nor its regulations provide for the right to counsel or the right to cross-examine and call witnesses at marriage petition proceedings.

 However, as I noted at the outset, the INA and its regulations are only the starting point for the procedural due process inquiry. The INS cannot deny marriage petitioners the procedural rights its regulations guarantee, but procedural due process might well require more than the regulations provide.

 The INS regulations aside, the Alis contend that the INS' marriage petition procedures are fundamentally unfair because there is no opportunity for petitioners to confront and cross-examine witnesses; to call witnesses on their own behalf and, to obtain a transcript of the proceedings. Without, of course, deciding the merits of this claim, I am persuaded that the Alis have raised a substantial constitutional question which survives the INS' motion to dismiss.

Due process is "a flexible concept which mandates varying procedures and different degrees of formality in sundry contexts." *Haitian Refugee Center*, 503 F.Supp. at 454. The fifth amendment grants "the aggrieved party the opportunity to present his case and have its merits fairly judged," which requires "some form of hearing ... before the [individual] is finally deprived of a protected ... interest." *Logan v. Zim-*

*merman Brush Co.*, 455 U.S. 422, 433, 102 S.Ct. 1148, 1156, 71 L.Ed.2d 265 (1982) (quoting *Board of Regents v. Roth*, 408 U.S. at 570–71 n. 8, 92 S.Ct. at 2705–06 n. 8 (1972)).

The constitutional adequacy of the timing and nature of the hearing must be judged by balancing the competing private and governmental interests at stake. *Mathews v. Eldridge*, 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976). First, the Court must consider the private interest affected. Second, the Court has to evaluate the risk of erroneous deprivation of rights under the challenged procedures and the probable value, if any, of additional or substitute procedural safeguards. Finally, the Court must balance the government's interest, which includes consideration of the function involved as well as the fiscal and administrative burdens that supplemental or substitute procedures would impose. *Id.* at 335, 96 S.Ct. at 903.

The INS contends that its procedures for investigating and deciding marriage petitions are fundamentally fair. It relies chiefly on the decisions in *Maggiore Bakery v. Esperdy*, 238 F.Supp. 374 (S.D.N.Y. 1964) and *Lechich v. Rinaldi*, 246 F.Supp. 675 (D.N.J.1965). Both decisions are, however, distinguishable from the Alis' claim and fail to support the INS' position.

First, each case involved an employer's petition to classify an alien as a first preference quota immigrant, not an American citizen's marriage petition. Such first preference petitions, like applications for adjustment of status are discretionary; even if an alien is statutorily eligible for first preference status or adjustment of status to permanent resident, the Attorney General can deny the petition or application in the exercise of his discretion. *See Elbez v. INS*, 767 F.2d at 1314; 8 U.S.C. § 1255. By contrast, a marriage petition must be approved if the Attorney General determines "that the facts stated in the petition are true and that the alien in behalf of whom the petition is made is an immediate relative specified in section 1151(b) of this title." 8 U.S.C. § 1154(b); *Chan v. Bell*, 464 F.Supp. at 127. The INS' decision on

marriage petitions turns exclusively on a question of fact—the couple's intent when they married—and not on policy considerations. This question, which turns on matters of intent and credibility, is particularly apt for the sort of fact-finding procedure sought by the Alis. *See Goldberg v. Kelly,* 396 U.S. 254, 269–70, 90 S.Ct. 1011, 1021–22, 25 L.Ed.2d 287 (1970).

Second, the private interest affected by the INS' procedures in this case is more compelling than in *Maggiore Bakery* or *Lechich* and the procedural protections may need to be more thorough. The marriage petition process judges a marriage's validity and so intrudes government into a constitutionally protected zone of basic privacy and autonomy. The aliens in *Maggiore Bakery* and *Lechich* wanted to come to the United States to pursue jobs; an important interest, of course, but the stakes involved when the INS decides a marriage petition are even higher, and go to the heart of this country's immigration policy. Moreover, a citizen and his or her spouse whose marriage is determined by the INS to be a sham may be subject to criminal prosecution for making false statements to the government. While that does not trigger the full panoply of procedural safeguards involved in criminal prosecutions, it does mean that the private interest involved is high and consequently the risk of an erroneous INS decision more damaging. *See Lassiter v. Department of Social Services,* 452 U.S. 18, 27 n. 3, 101 S.Ct. 2153, 2160 n. 3, 68 L.Ed.2d 640 (1981).

Third, *Maggiore Bakery* and *Lechich* were decided before the landmark Supreme Court procedural due process cases, *Mathews* and *Goldberg* and their progeny. I do not, of course, hold that those cases in effect overruled all prior procedural due process jurisprudence. Still, neither *Maggiore Bakery* or *Lechich* applied *Mathews* to the INS' marriage petition procedures, and their conclusions are thus entitled to less deference on this point. The *Lechich* Court, in fact, held that the INS visa petition procedures need not conform to the fifth amendment due process requirements at all, *Lechich,* 246 F.Supp. at 683, but only had to be fair in the more limited sense that the INS' decision must not be arbitrary, capricious or an abuse of discretion. *Id.* at 684.[8]

Finally, there is the decision in *Stokes,* a case virtually identical to this, which the INS does not attempt to distinguish. In *Stokes* the plaintiffs were two American citizens who had each married a Guyanese woman and filed petitions to classify them as their immediate relatives. One, who withdrew his request, claimed he did so under compulsion by INS officials. The other unwittingly signed documents withdrawing his application. *Id.* 452 U.S. at 27, 101 S.Ct. at 2159–60. The plaintiffs, seeking to represent a class of persons who filed marriage petitions with the New York District Office of INS, attacked the constitutionality of the INS' marriage investigation procedures. Specifically, they alleged that the procedures deprived them of procedural due process because at hearings they were not given the opportunity to confront or cross-examine adverse witnesses and minutes of the hearings were not transcribed. *Id.* at 28, 101 S.Ct. at 2160.

Finding that plaintiffs had valuable rights at stake in the marriage petitions which were entitled to fifth amendment

---

**8.** The INS also relies on *McLat v. Longo,* 412 F.Supp. 1021 (D.V.I.1976), decided after *Mathews* and *Goldberg,* in which a citizen whose marriage petition on behalf of his alien wife was denied, sought to reverse the INS' decision. Among numerous other claims, plaintiff alleged that the INS' administrative procedures violated his procedural due process rights. The *McLat* court denied plaintiff's motion for summary judgment because it found the INS' decision was not a clear abuse of discretion, *McLat,* 412 F.Supp. at 1025. Rejecting the argument that once a marriage has been proved, there is a strong presumption of its validity, the *McLat* court, after reviewing the facts, concluded that the INS' determination that the marriage was a sham was well-supported. Unreached was the plaintiff's due process claim, and what the court went on to say was, of course, simply dicta. Moreover, the *McLat* court supported its terse conclusion that plaintiff's "fair hearing argument has already been decided adversely," *id.* at 1027–28, with no analysis but simply a footnote citation to *Maggiore Bakery* and *Lechich.* Offhanded dicta is hardly convincing support for the proposition that *Maggiore Bakery* and *Lechich* survived the 1970's procedural due process revolution intact.

due process protection, *id.* at 29, 101 S.Ct. at 2160–61, the *Stokes* court concluded that the complaint raised "a substantial constitutional issue concerning the validity of [the INS] procedure." *Id.*

Almost two years after denying the INS' motion to dismiss, the *Stokes* court entered a lengthy consent judgment outlining procedures for investigating and adjudicating I–130 spouse visa petitions. The injunctive relief sought by plaintiffs in this case tracks the *Stokes* consent decree.

Because this matter is before the Court on a motion to dismiss, I need not explore at length the due process violations that allegedly devil the INS' marriage petition procedures. The Alis' inability to confront witnesses against them, and the INS examiner's refusal to allow witnesses brought by the Alis to testify, along with the lack of a transcript are sufficient, given the importance of the decision to the Alis and the difficult issue being decided to make out a procedural due process claim.

## V.

Finally, the INS contends that the Alis' claim against the INS and two INS investigators for money damages for violations of their constitutional rights should be dismissed. The claim against the INS (and the INS investigators in their official capacities) should be dismissed, the INS argues, because the Alis failed to file an administrative claim for damages required by the Federal Tort Claims Act, 28 U.S.C. § 2675(a). In their individual capacities, agents Molvar and Provencal cannot be sued, the INS argues, because they enjoy qualified immunity.

## A.

The Alis concede their failure to file a claim with the INS. That portion of their complaint is therefore dismissed.

9. The Alis contend that two circuits, the Eighth and the Ninth, have reached the opposite conclusion, that is, that INS Operation Instructions do provide substantive rights and that the INS' departure from those regulations is actionable. I am not persuaded.

## B.

A government official who enjoys qualified immunity loses it if he violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). "Whether an official may prevail in his qualified immunity defense depends upon the objective reasonableness of his conduct as measured by reference to clearly established law." *Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 3018, 82 L.Ed.2d 139 (1984).

The Alis assert that agents Molvar and Provencal violated Mohamed Ali's right not to be arrested and threatened with deportation on the basis of information obtained by threats and intimidation. Their reliance on *Navia-Duran,* however, is unavailing. *Navia-Duran* held only that use of an alien's involuntary statement at a deportation hearing violates the alien's fifth amendment procedural due process rights. *Id.* 457 U.S. at 808, 102 S.Ct. at 2732–33. It does not establish that an alien whose citizen spouse has filed a marriage petition cannot be arrested if that petition is withdrawn. *See Elbez v. INS,* 767 F.2d at 1314.

It is true that INS Operations Instruction 245.1(a) provides that the INS will not issue an order to show cause or arrest a deportable alien whose spouse has filed a marriage petition if approval of the petition would make the alien eligible for adjustment of status. However, this instruction can be set aside if the INS district director believes the marriage petition is "frivolous or there are substantial adverse factors which ... would probably lead to denial of adjustment of status ..." INS Operations Instruction 242.1(a)(24). Moreover, the INS' own in-house rules do not create a substantive fifth amendment right. *See Pasquini v. Morris,* 700 F.2d 658 (11th Cir.1983); *Dong Sik Kwon v. INS,* 646 F.2d 909 (5th Cir.1981).[9]

First, I do not believe that the cases cited by the Alis support that proposition. For example, *Nicholas v. INS,* 590 F.2d 802, 807 (9th Cir.1979) was severely limited by *Romeiro de Silva v. Smith,* 773 F.2d 1021 (9th Cir.1985) decided after the INS amended its Operation Instruc-

The Alis next assert that agents Molvar and Provencal violated Yolanda Ali's fifth amendment right against compelled self-incrimination. As explained above, the constitutional injury, if any, came not from the risk of criminal consequences, but from the use of the involuntary statement at the marriage petition hearing. The agents participated in that injury in the strict sense that they forced Yolanda Ali to make the statement, but they did not conduct the hearing and so cannot be personally liable for the due process violation.

Accordingly, I am not persuaded that the Alis have made out cognizable claims for damages against agents Molvar and Provencal in their individual capacities, and their motions to dismiss must be granted.

### Summary

In summary, the claims against Molvar and Provencal are dismissed. The due process claims asserted by the Alis survive to the extent discussed above. The matter will proceed for a resolution of the discrete issues of (1) did the INS coerce an involuntary statement from Yolanda Ali for use at the marriage petition hearing? (2) did the INS fail to follow its own regulations and procedures? and (3) did the INS regulations, even if followed, provide procedural due process?

SO ORDERED.

tions. The Eighth Circuit cases cited by the Alis simply do not support the proposition the Alis would extract from them. *See, e.g., David v. INS,* 548 F.2d 219, 223 (8th Cir.1977); *Vergel v. INS,* 536 F.2d 755, 757–58 (8th Cir.1976).

Second, even granting the Alis' assertion, it is not enough to support the claim that the INS agents violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. The Alis admit that two other circuits, the Fifth and Eleventh, have held that the INS Operation Instructions do not confer substantive rights but are merely in-house rules. Where the circuit courts do not agree, it is asking too much to suppose that INS agents be presumed to predict the ultimate resolution of the issue and act accordingly or face *Bivens* actions.